**Rose CLANCY, Plaintiff,**

v.

**PRESTON TRUCKING COMPANY, INC., Defendant.**

**Civil Action No. 96–236 MMS.**

United States District Court,
D. Delaware.

Decided June 18, 1997.

Michael W. Modica, Wilmington, DE, for plaintiff.

James J. Sullivan of Klett, Leiber, Rooney & Schorling, Wilmington, DE (Julia A. Martin of Matkov, Salzman, Madoff & Gunn, Chicago, IL, of counsel), for defendant.

## *OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

### INTRODUCTION

Rose Clancy ("Clancy") filed a complaint against her former employer, Preston Trucking Co., Inc. ("PTC"), alleging age and sex discrimination, breach of the implied covenant of good faith and fair dealing, and intentional infliction of emotional distress. PTC filed a motion for summary judgment. In her response to the motion, Clancy withdrew her claims of sex discrimination and breach of the covenant of good faith and fair dealing. After oral argument, her claim for intentional infliction of emotional distress was withdrawn in light of the holdings of the Delaware Supreme Court in *State v. Cephas*, 637 A.2d 20, 29 (Del.1994), and *Konstantopoulos v. Westvaco*, 690 A.2d 936 (Del.1996). Accordingly, before the Court is PTC's motion for summary judgment on Clancy's claim of age discrimination; for the following reasons, it will be denied.

### FACTS

The facts, viewed in a light most favorable to the plaintiff, are as follows. Prior to her termination, Clancy was employed as a full-time clerical office worker by PTC, a trucking company. A146–46.[1] At the time she was fired, she was 55 years old and had been employed by PTC continuously for 21 years. A145; A152.[2]

At the time of her hiring, and throughout her tenure there, Clancy was paid on an hourly basis, as were the other clerical employees. A147–148. PTC provided time

---

1. The references beginning with "A" or "B" refer to the parties' appendices.

2. The parties could not point to support in the record for Clancy's age; however they stipulated at oral argument her date of birth was January 20, 1940.

clocks for hourly employees to use when beginning and ending their shifts; during the relevant time period, however, the time clock in the office where Clancy worked was out of order. A151; A161–162. She and the other clerical workers developed a practice of writing their hours on their time cards by hand. A162–163; B163a; B198.

In the early 1990's, PTC was sold to Yellow Freight. A165. As a result, PTC was forced to tighten its belt—terminal manager Howard Coho testified in his deposition as to the pressure he was under to cut costs. A242; B76. Wage cuts and freezes were instituted, along with a ban on overtime. A166.

Until the ban on overtime, Clancy had worked small amounts of overtime on a regular basis. A199. Her time cards show she often began work ten or fifteen minutes earlier than her required shift. See e.g. A61–A68. Clancy testified in her deposition that her practice of arriving early to work continued after the ban on overtime as she wanted to ensure she was never late. B191–193. Clancy also testified the atmosphere in the clerical office was often so busy that, upon arrival at work, she immediately began working regardless of whether or not her shift had officially started. A186. Therefore, she developed the habit of simultaneously writing in both her beginning time and her ending time, at some slow point during the day. A187. Because there was no overtime, Clancy explained, she was required to work her exact shift and no more; thus it seemed uncontroversial just to enter her shift hours on her time card. Id.

From the beginning of her employment at PTC, Clancy worked day shifts—often, from very early in the morning. A146. Several months before her termination, however, Coho, to whom she reported, changed her hours to begin at 11:00 a.m., and then 1:00 p.m., requiring her to work into the evening. A176–77; B40–43. For example, when she began work at 1:00 p.m., her shift did not end until 10:00 p.m.[3] Id. Clancy discussed with Coho the fact she did not wish to work late shifts, and as the member of the staff with

the most seniority, she should not be required to do so. B42–43. Her objections were overruled and, up until her termination, Clancy worked until 10:00 p.m. A172.

Coho's explanation of the reason for this change is that the managers decided it was important to enter certain reports into the computer by midnight on the same day they were generated, instead of one day after the fact. A249. As Clancy was the quickest and best at entering these reports, Coho asserted, he moved her to a later shift which would permit her to enter these reports the same day they were generated. A250.

However, deposition testimony by Linda Belcher, a member of the sales staff, casts doubt onto Coho's stated reason for the change. Belcher testified the change in shift was part of Coho's campaign to force Clancy to quit. B113–114. According to Belcher, Coho stated in her presence he wanted to get rid of Clancy and would do everything he could to reach that goal. B109. Apparently Coho envisioned the daughter of a friend in Clancy's position. B112.

Along with his desire to install his friend's daughter in Clancy's position, Coho apparently felt Clancy had been working at PTC too long. B113. He made statements to the effect he wanted some new blood, and that he preferred someone younger and more vibrant. Id. Coho reportedly said Clancy was "older than dirt" and she had been with PTC "when the first stone was laid." B113; B120.

Belcher further reported an incident involving Coho and Bill Citerone, another management employee, after Clancy was fired. B155. According to Belcher, the two were going out to celebrate Clancy's termination; and in that conversation, one of the two said "we won"—a reference to Clancy's leaving PTC. B155–156.

Belcher is not Clancy's only support. Clancy herself testified Coho said she had been there "since the first of time" and that the "building was built around" her. B36. The fact that management was trying to force Clancy out also was corroborated by

---

**3.** At some points in her deposition, Clancy indicates this last shift began at 2:00 p.m. and worked until 10:00 p.m. See A187. This discrepancy is not explained in the record.

Susan Hoskins, another clerical worker. B170.

Clancy apparently made her peace with the change in shifts and work continued as usual until May 17, 1995. On that date, Coho attempted to reach the clerical office by telephone between 8:30 p.m. and 9:30 p.m. because he learned there was a small chemical spill at the terminal, where the office was located. A243.[4] When no one answered the phone, he became concerned. *Id.* Finally, he was able to reach a non-clerical employee who related to him that no one was in the office. A244–245. Clancy, along with several other employees, were scheduled to work at the time of Coho's phone call. A282–287. Coho learned thereafter that all the employees who were supposed to be working that night had signed out early, with the exception of Clancy. *Id.* Clancy's time card—handwritten—indicated she worked until 10:00 p.m., but she clearly was gone for the day when Coho called. A245–246.[5]

Several days later, Coho confronted Clancy. A201. Coho already had spoken to Donald Hargett, the vice president of industrial relations, who had directed him to investigate the situation and fire Clancy unless there were mitigating circumstances. A258. According to Coho and Hargett, Clancy's actions constituted dishonesty and falsifying company records for which the penalty was immediate termination. A261; B93; *see also* PTC Procedure Manual, A5. Hargett submitted an affidavit stating he always enforced that rule with respect to employees who falsified their time cards regardless of age, gender or any other characteristic. A275. However, Hargett also seemed to agree there could be mitigating factors under which an employee's job could be spared in such a situation, for example, if Clancy had left sick and had forgotten to change her time card. A262.[6]

When questioned, Clancy admitted to going home early. A201. She believed she had not done anything wrong given the fact she regularly arrived early, and because she could not be paid overtime. A202. She composed and signed a written statement to this effect. A202–203. Clancy also admitted familiarity with the procedures manual. A181. Coho informed her the penalty for the falsified time card was immediate termination, but offered her the option of resigning. A203. Clancy refused, and Coho terminated her.[7] *Id.*

Clancy did not mention this at the time, but she has since asserted that a system of "comp" time came into existence around the time PTC informed its employees there would be no more paid overtime. A212. She maintains Coho told her several times, since she came in early on a regular basis, she could on occasion leave early if her work were finished. A189; A193. That there was a system of "comp" time in effect was corroborated by Judy Gregory, another clerical employee; however Gregory said she only used it with explicit permission from Coho. B223.

After her termination, Clancy suffered sleeplessness, depression and anxiety. A223. Clancy wrote a letter dated May 24, 1995, to Leo Suggs, the president of PTC. A85. In the letter, she alleges discrimination and harassment, and asks for her job back. A87. It is unclear whether there was any response. According to PTC's employment records, Jody Seymour, a part-time employee aged 28, was hired to replace Clancy. B9; B12.

---

4. The plaintiff seems to argue this, too, is pretextual. She submits an affidavit that no such spill was reported to the Delaware Department of Natural Resources and Environmental Control. B25.

5. From the record it is unclear whether the time clock was broken on this particular day, or whether Clancy, out of habit, wrote her time in by hand.

6. At oral argument, counsel for PTC conceded the company had received its full eight hours of work from Clancy that day.

7. There is some dispute over who made the decision to terminate Clancy. Hargett testified he instructed Coho to hear Clancy's side of the story and, unless there were mitigating factors, to terminate Clancy. A260. Coho said the decision to terminate was his. A247. PTC argues the decision was Hargett's. Giving Clancy the benefit of the dispute, as it must on summary judgment, the Court will consider that the decision to terminate was Coho's.

## DISCUSSION

### I. Legal Standards

#### A. Summary Judgment

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 requires the Court to enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). "When the nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden." *Bray v. Marriott Hotels*, 110 F.3d 986, 989 (3d Cir. 1997). "The nonmoving party creates a genuine issue of material fact if he or she provides sufficient evidence to allow a reasonable jury to find for him or her at trial.... In reviewing the record, the court must give the nonmoving party the benefit of all reasonable inferences." *Id.*

#### B. Employment Discrimination

The Age Discrimination in Employment Act ("ADEA") prohibits employers from discriminating against individuals on the basis of their age. *See* 29 U.S.C.A. §§ 623–634 (West 1985 & Supp.1996). As applicable to the present case, the statute states: "It shall be unlawful for an employer ... to discharge any individual ... because of such individual's age." *Id.* § 623(a)(1).

The Supreme Court has developed two analytical frameworks to evaluate a plaintiff's proof of discrimination.[8] The first, often referred to as "pretext," was developed to address the difficulty in obtaining direct evidence of discrimination. *See Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1071 (3d Cir.1996), *petition for cert. filed*, 65 U.S.L.W. 3571 (U.S. Feb. 3, 1997) (No. 96–1231); *see also Thornbrough v. Columbus and Greenville R.R. Co.*, 760 F.2d

633, 639 (5th Cir.1985) ("Employers are rarely so cooperative as to include a notation in the personnel file, 'fired due to age,' or to inform a dismissed employee candidly that he is too old for the job."). In a pretext case, a plaintiff must meet a prima facie case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The prima facie case for discriminatory termination is: (1) the plaintiff was a member of a protected class, (2) she was qualified for the position in question, (3) she suffered adverse employment action, and (4) she was replaced by someone who was sufficiently younger than her. *See e.g. Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir.1995).

The prima facie case is not "onerous"; it merely serves to "eliminate[ ] the most common nondiscriminatory reasons" for the adverse employment action. *Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1093–94. The prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Id.* at 254, 101 S.Ct. at 1094 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978)).

Once the prima facie test is met, the burden of *production* shifts to the defendant to rebut the prima facie case by producing evidence of a "legitimate, nondiscriminatory reason" for the action. *Id.* The defendant need not "persuade" the factfinder that the reason offered was its true reason; it must merely "articulated" such a reason. *Id.* at 257, 101 S.Ct. at 1095–96. "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* at 254, 101 S.Ct. at 1094.

---

**8.** Analysis of ADEA cases is often interchangeable with that of Title VII cases. *Miller v. CIGNA Corp.*, 47 F.3d 586, 592 (3d Cir.1995) (en banc).

If the defendant meets its burden of rebutting the plaintiff's prima facie case, the plaintiff is given the opportunity to prove the legitimate, nondiscriminatory reason offered by the defendant is not the true reason for the action. *Id.* at 256, 101 S.Ct. at 1095. This burden "now merges with the ultimate burden of persuading the [fact finder] that she has been the victim of intentional discrimination." *Id.* A plaintiff can accomplish this last requirement "either directly by persuading the [factfinder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* It is important to reiterate, however, in pretext cases the burden of *persuasion* remains with the plaintiff at all times. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94; *Sheridan,* 100 F.3d at 1066.

■ On the other hand, if the plaintiff is able to adduce "direct evidence" of discrimination, "and the evidence as a whole permits a conclusion that both permissible and impermissible considerations played a role in the employer's decision, the plaintiff need only show that the unlawful motive was a substantial motivating factor in that decision." *Miller v. CIGNA Corp.,* 47 F.3d 586, 594 (3d Cir.1995) (en banc); *see also Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). If that is accomplished, the burden of *persuasion* then shifts to the defendant to prove the discrimination was not a "but-for cause" of the unfavorable employment action. *Miller,* 47 F.3d at 594. In other words, the employer "must show that its legitimate reason, standing alone, would have induced it to make the same decision." *Price Waterhouse,* 490 U.S. at 252, 109 S.Ct. at 1792.[9]

This later type of case is termed "mixed-motive." The rationale behind the shift in burden of persuasion was explained in *Price Waterhouse:* "[W]here a plaintiff has made this type of strong showing of illicit motivation, the factfinder is entitled to presume that the employer's discriminatory animus

made a difference to the outcome, absent proof to the contrary from the employer." 490 U.S. at 276, 109 S.Ct. at 1804 (O'Connor, J., concurring).

The plaintiff presents her case under both analytical frameworks. The Court will consider each separately below.

### 1. Direct Evidence/Mixed Motive

Clancy relies on Belcher's deposition testimony as direct evidence that discrimination was a substantial motivating factor in her discharge. Specifically, she asserts, Coho expressly stated he wanted her employment at PTC to come to an end, and he made a number of comments arguably demonstrating age-based animus. For example, Coho stated Clancy was "older than dirt," "been here since Christ," had been there "when the first brick was laid" and "the building was built around [her]." D.I. 37, at 29.

■ PTC attempts to deflect this evidence by asserting the decision to terminate Clancy was Hargett's alone and there is no evidence he harbored age-based animus. As explained above, there is a factual dispute over who was responsible for the ultimate decision to terminate Clancy. Accordingly, summary judgment based on the fact that Hargett was the decisionmaker would be inappropriate.

Alternatively, PTC argues, Coho's statements were merely stray remarks insufficiently connected to the termination to amount to direct evidence. As noted by the Supreme Court in *Price Waterhouse* in connection with sex discrimination, "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision." 490 U.S. at 251, 109 S.Ct. at 1791.

■ The Third Circuit Court of Appeals recently discussed the line between "direct evidence" and "stray remarks." *Starceski v.*

---

**9.** Later courts often refer to a "burden-shifting instruction" under *Price Waterhouse. See Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1097 (3d Cir.1995). This is a reference to an instruction in a mixed motives case that the defendant will bear the burden of *persuasion* that the act was not motivated by discrimination. It is not to be confused with the "burden-shifting" terminology often used in pretext cases to refer to the shift in the burden of *production.*

*Westinghouse Elec. Corp.*, 54 F.3d 1089 (3d Cir.1995). It stated:

> [P]urely statistical evidence would not warrant [a *Price Waterhouse* 'mixed motives'] charge; ... nor would 'stray' remarks in the workplace by persons who are not involved in the pertinent decisionmaking process.... If however, the plaintiff's non-statistical evidence is directly tied to the forbidden animus, for example[,] policy documents or statements of a person involved in the decisionmaking process that reflect a discriminatory or retaliatory animus of the type complained of in the suit, that plaintiff is entitled to a burden-shifting instruction.

*Id.* at 1097 (citations omitted). This distinction is made because "direct evidence of discriminatory animus leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it." *Id.*

In *Starceski*, the court held a *Price Waterhouse* instruction was appropriate based on evidence the plaintiff's supervisor was instructed to take age into account when determining which employees would be laid off; to transfer work from older to younger employees and to alter the plaintiff's employment appraisals to reflect unsatisfactory employment. The court stated: "These directives ... are precisely the kind of evidence that is needed to indicate 'that [the] decisionmakers [involved here] placed substantial negative reliance on an illegitimate criterion [i.e. age] in reaching their [termination] decision." *Id.* (quoting *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1805 (O'Connor, J., concurring)). *See also Wilson v. Susquehanna Township Police Dep't.*, 55 F.3d 126, 130 (3d Cir.1995) (finding sufficient direct evidence of animus against women in "extremely offensive sexual environment" in which police chief participated to warrant burden-shifting instruction in failure to promote case).

■ Using the distinction highlighted in *Starceski*, the Court holds Clancy has adduced sufficient direct evidence of age-animus to warrant a burden-shifting instruction under *Price Waterhouse*. Accepting the facts favorable to her, Coho made several comments demonstrating age-animus in close connection with his statements he intended to force Clancy to quit. In fact, his comments could be interpreted by a fact finder to demonstrate he wanted her employment at PTC to end *because* of her age. He then, at the first opportunity, terminated Clancy—an employee who had been employed with PTC for 21 years—under circumstances where her time card had been filled out incorrectly, but an issue of fact remains as to whether she had literally stolen time from the company.

Thus, the evidence as a whole permits the conclusion that both the time card incident as well as Clancy's age played a role in Coho's decision to terminate her. That is because Coho allegedly permitted others to take "comp" time in lieu of overtime; however, he fired Clancy for doing the same thing.[10] Clancy has satisfied her burden of demonstrating her age was a "substantial motivating factor" in the decision.

### 2. Pretext

Clancy's prima facie case of discriminatory termination based on age is: (1) she was over 40, (2) she was qualified for the position in question, (3) she was terminated and (4) she was replaced by a sufficiently younger person. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir.1995).

■ The defendant does not dispute Clancy has met her prima facie case. It argues, however, its nondiscriminatory reason is legitimate—the falsified time card. The Court agrees this is a legitimate reason; however, that determination does not entitle PTC to summary judgment. The inquiry now shifts

---

10. PTC asserts in its briefs that this explanation cannot be relied upon to raise a genuine issue of material fact because it contradicts Clancy's position when she was confronted that it was her unilateral decision to leave work early that day without changing her time card. D.I. 34, at 20–21. However, on these facts, plaintiff's later deposition testimony does not contradict her original position. Clancy's argument regarding "comp" time is not in direct conflict with her earlier position that she unilaterally decided to leave early on May 17, 1995—it merely forms a backdrop to her decision to do so. Moreover, the fact that "comp" time was on occasion permitted, albeit with permission, was corroborated by other clerical employees.

back to plaintiff to prove by a preponderance of the evidence "that age 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome' of that process." *Miller*, 47 F.3d at 596 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993)). As explained above, the plaintiff may do so by "persuading the [factfinder] that a discriminatory reason more likely motivated the employer or by showing the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

The exact nature of the plaintiff's burden at this procedural juncture was explored decisively in *Sheridan*, 100 F.3d 1061. The court interpreted Supreme Court case law to hold:

> [T]he elements of the prima facie case and disbelief of the defendant's proffered reasons are the threshold findings, beyond which the jury is permitted, but not required, to draw an inference leading it to conclude that there was intentional discrimination. . . . It follow[s] that a plaintiff may survive summary judgment . . . if the plaintiff produced sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action.

100 F.3d at 1066–67. *See also Bray*, 110 F.3d at 990.

Clancy has produced evidence of age-based animus on the part of her supervisor, Coho. Moreover, there is evidence other workers at PTC were permitted to take "comp time" in lieu of paid overtime and Coho had extended that same offer to Clancy. Nevertheless, when the occasion arose and Clancy left early, Coho terminated her. This evidence is sufficient to cast doubt on PTC's position it fired Clancy for falsifying her time card. Accordingly, PTC's motion for summary judgment will be denied.